## UNITED STATES v. McDEVITT.
### No. 300.

Circuit Court of Appeals, Second Circuit.
June 7, 1937.

Joseph A. McNamara, U. S. Atty., of Burlington, Vt., and Julius C. Martin, Wilbur C. Pickett, Keith L. Seegmiller, and Fendall Marbury, all of Washington, D. C., for the United States.

Gelsi Monti and Finn & Monti, all of Barre, Vt., for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment entered upon the verdict of a jury in a suit to recover upon a war risk insurance policy, issued to the plaintiff. He was mustered out and the policy lapsed on April 28, 1919, and the question is, whether at that time he was "totally and permanently disabled." The writ was served on March 4, 1933, nearly fourteen years after the supposed right of action arose, and the plaintiff's history meanwhile had been in substance as follows. Until September 2, 1919, a period of four months, he did nothing, but he then resumed his old work of bookbinding, at which he continued until February 27, 1920, a period of five months, during which he lost but one week. He swore that he threw up this job because he was nervously debilitated, and that he went for two months to a hospital; the hospital record shows that he had chronic bronchitis and inflammation of the eyelids, and contained no mention of his nerves. In March he applied for and was given compensation because of "pains in the chest caused by gassing." He left the hospital on May tenth and took the veterans' training, recommended by the Veterans' Bureau, for six or seven months, but left because again, as he swore, he was too nervous to continue. From January, 1921, to June, 1924, he appears not to have done any work at all, his explanation as before being that he tried to do so once or twice, but found that his nerves gave out. For three or four months after June, 1924, he drove a taxicab on the outskirts of Boston and earned fifteen or sixteen dollars a week; his explanation for throwing up this job

was that it was a strain on him, and that he had taken it up at all only because he had to do something. From the autumn of 1924 until May 1, 1925, apparently he was again idle, but from then until October 9, 1925, he was the driver of a public bus at $37.50 a week, with no time out. He made six round trips a day, between 7:30 a. m. and 4:30 p. m., had but one accident, and that a minor one. This job he left because the man returned who had had it before. He did nothing for a year; but on October 9, 1926, he began work in a greenhouse where he stayed until August 6, 1927, a period of ten months, during which his employer testified that he was a good worker and had lost no time. He had before this married and he took his wife to Vermont because of her illness, though he gave his nervous trouble as an added reason for the change. In Vermont he did odd farm jobs, but was incapacitated, as he said, to do much until October 9, 1928, when he became a laborer in a factory at Waterbury, Vermont, where he stayed for about sixteen months, until January 24, 1930, during the whole of which time he lost only one month. He lost this place because he was quarrelsome, irritable and nervous. From January 24, 1930 to August 10, 1931, he again did odd jobs, this time street cleaning; his work was poor, but he got another job of four months in a tool room until December, 1931, after which although he did some work here and there, he has had no gainful occupation. It thus appears that roughly speaking, for the first twelve and a half years after he was mustered out, he was gainfully occupied for about two-fifths of his time.

The jury might certainly have found that he was a pronounced neurasthenic, and perhaps he had always been so. Like most such persons, he was a constant frequenter of doctors' offices, and for this reason there is an abundant harvest of records about his condition. He was examined first on May 13, 1920, by a Dr. Black; again on June 28th and September 22nd, 1920, by Dr. Banquer; on December 4, 1920, by Dr. Lowe; on April 5, 1921, by Dr. Hanlon; on November 7, 1921, by Dr. Fitzgibbon; on November 8, 1922, and March 13, 1923, by the same Dr. Banquer; on April 27, 1923, once more by Dr. Black; August 28, 1923, by Dr. Colter; and on August 13, 1926, by Drs. Cauley and Burnette. Thus in a period of seven years

he had been examined eleven times by eight doctors, whose reports were in evidence. In not a single one of these is there any complaint of any nervous condition, and his testimony is wholly incredible that he had told the physicians anything about it. The very fact that in 1928 and later other reports contain this factor, as will appear, is enough to disprove his testimony. After the suggestion once came to him, he seized upon it eagerly enough, and made it one of the reasons for his application for further compensation on December 12, 1930. The only rational conclusion is that it had not begun to count with him until about 1928. Moreover, on June 24, 1931, in an application for insurance to the John Hancock company he declared himself "free from all physical defects and infirmities," in spite of the application for compensation, six months before, which, besides mentioning neurasthenia, had alleged that he was suffering from "chronic bronchitis, astigmatism, blepharitis, valvular heart trouble, rheumatism." He had been receiving $10.50 a month disability compensation since his first application of March 13, 1920; a circumstance—considering his earning capacity, even in good health—which might have affected his willingness to exert himself, when feeling ill.

He attempted to buttress his case by the reports of three physicians. One of these, Dr. Wright, had examined him on August 23, 1928, and the other, Dr. O'Neil, on January 8, 1931; both found him then suffering from a psychoneurosis and so did Dr. Leanly on March 21, 1930. Dr. O'Neil was called as a witness and swore that in 1931 and again in 1935 the plaintiff was extremely nervous, and in his judgment was then incapacitated for work. His report of 1931 had declared that his psycho-neurosis was "moderate. Very likely a permanent disability"; that of 1935, that it was "psycho-neurosis. Neurasthenic type, severe." He swore that the disability was permanent and that "it would seem fair to me that his condition is due to things that developed during his army service." At first this witness would not state definitely, however, whether the same condition prevailed at the time of his discharge; later he added: "I also know that once one of that type develops it is not often likely to subside without some

very adequate treatment. For that reason I venture the opinion that it existed at the time he was discharged." Dr. Wright also testified that he was incapacitated for work when he saw him, and that such a malady was "a permanent condition as a rule," and that "without doubt it" (his war service) "was the cause of his present trouble." When asked "whether or not his condition was the same before April 28, 1919, as it is now," he answered, "From the history I will say 'yes.'" This is the upshot of all the expert testimony.

We held in United States v. Clapp, 63 F.(2d) 793, that the phrase of the regulation, requiring for permanency that the disability shall be "founded on a condition which renders it reasonably certain that it will continue," refers to the lapse; it must be "reasonably certain" at that time that the condition is permanent. A number of other courts have so held. Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492, did not disturb this, though it declared that the regulation should not be treated as exhaustive. If our decision is right, the case is at an end, for there was no evidence to justify the finding that on April 28, 1919, it was reasonably certain that the plaintiff's neurasthenia would be permanent. Dr. O'Neil did not say so; indeed his answer just quoted suggests that "very adequate treatment" would have abated it, at least in part. If on the other hand the words, "reasonable certainty" are taken as of the time of the trial and prospectively, there was undoubtedly evidence that at that time— seventeen years after the lapse—the plaintiff's condition was permanent. But on that theory he must have shown himself totally disabled during all the interval. Literally he was not so disabled, as his work record abundantly shows; but again if we look to the regulation, that requires only a disability which shall not allow the insured "to follow continuously any substantially gainful occupation." How far interruptions in his employment caused by his malady, bring him within this language, and how far it is absolutely controlling, was the principal subject of the decision in Lumbra v. United States, supra. The facts there were very like those at bar; the plaintiff was a neurasthenic, who eventually developed epilepsy; meanwhile, he had done work, off and on, for more than half the

time; had represented him as not totally disabled both in applying for compensation and to physicians, who had not diagnosed him as such; and he had delayed suit for twelve years. Such temporary interruptions of work were held not to be enough. The plaintiff's case is weaker in every point except that he worked for a somewhat smaller part of the time. His repeated examinations and his own declarations preclude the conclusion that he could have been totally disabled; and he was shown to be a person of no credibility whatever, who did not hesitate to say whatever would serve the occasion. That he was of a disordered nervous make-up is plain enough; and that his disorder made him liable to periodic fits of irritability or depression when he would not, and perhaps could not, keep at work, a jury might well find. He was plainly one of those persons of instable emotional balance, who find adjustments to life very difficult and whom the dreadful experience of war may unfit for a normal life, but he was not totally disabled in the sense that that phrase was read in Lumbra v. United States, supra. It must be owned that both the medical experts said that they thought that his condition was the same at the lapse as when they examined him, and that then he was not able to work. But Dr. Wright's opinion was based upon nothing but the record of his war experience, and a very general statement of his condition after he was mustered out, without including all that he had done thereafter, or the reports of the other physicians who had examined him. It was valueless as evidence for this reason. Dr. O'Neil's opinion was at best tentative. At first he refused to commit himself at all; it was only when pressed by the judge that he "ventured the opinion" that his condition had been the same when he was discharged. That was certainly not a positive expression; not enough, we think, to stand against the record as a whole. A man who can hold jobs for ten and sixteen months at a stretch, is not "totally disabled," even though he must give up for a season and seek work anew. Upon the whole case, taken in connection with the unexplained delay in prosecution of the claim, we think that there was no basis for a verdict for the plaintiff.

Judgment reversed.